**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-20239-CR-ALTONAGA**

**UNITED STATES OF AMERICA**

vs.

**HAVA YFRAH AUSTIN,**

      **Defendant.**
_____/

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through the undersigned Assistant United States Attorney, hereby files its Sentencing Memorandum. As previously argued in its Response to Defendant's Objections [ECF. No. 43], the government's position is that the correct guideline range is 41-51 months' imprisonment, and that a guideline sentence is warranted. A sentence of 51 months imprisonment is justified under 18 U.S.C. § 3553(a).

    **I.**    **Guideline Calculation**

Initially, there were two objections impacting the guidelines. Now, Defendant concedes that the abuse-of-trust enhancement applies to her conduct. *See* ECF No. 48 (Reply to Objection, p.1). As such, the only remaining objection to the PSR is the loss amount. Pursuant to their plea agreement, the parties recommend that the Court apply the 18-level enhancement for loss between $3.5 and $9.5 million, resulting in a sentencing range of 41-51 months imprisonment.

    **II.**    **A Guideline Sentence is Appropriate**

Once the guidelines are properly calculated, the Court must determine the appropriate

sentence after considering the factors set forth in 18 U.S.C. § 3553(a).[1] It is the government's position that the factors in § 3553(a) support a guideline sentence of 51 months imprisonment.

<u>First</u>, a guideline sentence is appropriate to reflect the seriousness of this type of offense and promote respect for the law. This was without question a serious offense. The Defendant's crime took place over the course of almost seven years, during which she systematically defrauded over $9 million dollars from her trusting employer. Defendant didn't make a bad decision or mistake in judgment on one or two occasions. Rather, week after week, month after month, year after year, she purposefully transferred funds from her employer's account into her own. She used her access to the company bank accounts to commit the fraud. And she used her responsibility for recording the transactions to conceal the crime. Defendant only stopped stealing when one of the owners happened to notice suspicious transactions in one of the accounts. Even after she was confronted, she lied and minimized the extent of her scheme and the magnitude of the loss. Additionally, this crime was serious not only in objective terms, but in the subjective impacts it has had on the victim company and its owners. *See* Govt. Ex. 1 (Victim Letter).

<u>Second</u>, Defendant's history and characteristics support a guideline sentence. Defendant is an intelligent, educated individual. She earned a bachelor's degree in accounting and a master's

---

[1] Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed-- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ... (5) any pertinent policy statement (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

degree in business administration. She ran an accounting business for two decades where she made a comfortable income. In her 2023 tax return, she reported over $336,000 in taxable income (without counting the embezzled funds). By her own account she had a "happy childhood," and continues to have a "close" and "very supportive" family. Indeed, the owners of the victim company thought of her as a trusted employee and friend. Despite all these advantages and opportunities in life, Defendant deliberately turned her back on her employer and robbed them. To make matters worse, when her scheme was unraveling she failed to accept responsibility, lied to the owners, and minimized the true loss. And despite receiving over half a million dollars from the sale of two properties in late 2024, she has yet to repay the victims anything. Moreover, while it is true that she has no criminal history points or "brushes with the law," she has not been a "law-abiding citizen for her entire life." She committed crimes on a regular basis for over seven years and only stopped committing these crimes because she was caught.

Defendant claims that she committed her crime due to a gambling addiction. While there is no doubt that a considerable portion of the proceeds were used to gamble, it remains unclear what happened to it all. The records Defendant recently provided do not account for all the stolen funds or their ultimate disposition. It's also notable that Defendant amassed considerable personal wealth in real estate (well over $500,000) while she stole from her employer. There is no evidence that she suffered serious personal financial hardship due to her gambling. She did not lose her two homes, file for bankruptcy, steal from her family, or fail to live up to other personal and professional obligations. She didn't steal from any other clients. In other words, her employers suffered much more financially from her gambling addiction than she did.

While there is no outright ban as to a downward variance based on gambling addiction, the Guidelines explicitly state that "[a]ddiction to gambling is not a reason for a downward departure."

3

U.S.S.G. § 5H1.4. This prohibition was added to the Guidelines on October 27, 2003, through Amendment 651, and is reinforced in U.S.S.G. § 5K2.0(d) ("Prohibited Departures"), which provides in relevant part that "the court may not depart from the applicable guideline range based on any of the following circumstances: (1) Any circumstances specifically prohibited as a ground for departure in … the last sentence of 5H1.4 …." Many of the cases relied on by Defendant in support of her sentencing request involved *departures* that were granted before Amendment 651 took effect, and therefore carry little value now.[2] Even the main case Defendant relies on, *United States v. Dikiara*, 50 F.Supp.3d 1029, 1031 n.1 (E.D. Wisc. 2014), acknowledges that U.S.S.G. § 5H1.4 "indicate[s] that addiction to gambling [is] not a reason for a downward departure."

In support of her request for no incarceration, Defendant relies on two district court cases that varied downward based on gambling addiction. Those cases are distinguishable. In *Dikiara*, for example, the defendant stole *one-tenth* of the amount Defendant stole. And that defendant provided casino records establishing losses far exceeding what she stole, meaning that she used much of her own money to gamble rather than using only her employer's funds. In fact, the defendant's gambling compulsion was so bad it caused her to spend most of her husband's $300,000 retirement account, to lose her home to foreclosure, and to fail to pay her taxes. *See Dikiara,* 50 F.Supp.3d at 1030. None of those factors are present here. As explained above, Defendant's gambling had little financial impact on anyone but her employer. That she was able to maintain a comfortable lifestyle and run a successful business undermines the view that her addiction was so pronounced that she was compelled to steal from her employer, or that she should

---

[2] Those cases include *United States v. Sadolsky*, 234 F.3d 938 (6th Cir. 2000); *United States v. Checoura*, 176 F. Supp. 310 (D. N.J. 2001); and *United States v. Roach*, 2001 WL 664438 (2001).

face no meaningful punishment for doing so.

Defendant's reliance on *United States v. Chan*, 2018 WL 3031853 (D. Conn. 2018) is even more misplaced than *Dikiara*. In *Chan*, the sentencing court varied down 12 months from a low-end guideline sentence and imposed probation on a defendant who failed to report $386,000 that he embezzled from his employer on his tax returns. The court did so based on his "decades-long gambling disorder." The differences between this case and *Chan* are obvious, including the type of crime he was convicted of committing, the applicable guideline sentencing range, the length of the misconduct, and the amount of loss caused. In sum, while the Court has discretion to consider gambling addiction as a basis for a variance under § 3553(a), this is not the case to do so when considering all of the applicable factors.

<u>Third</u>, general deterrence is a key consideration in fashioning a sentence in a white-collar case. The Eleventh Circuit has specifically commented on the special need for general deterrence in fraud cases:

> General deterrence is more apt, not less apt, in white collar crime cases. The reason is that 'economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity,' which makes them 'prime candidates for general deterrence.'

*United States* v. *Howard*, 28 F.4th 180, 209 (11th Cir. 2022) (citing and quoting *United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013)). Far from dismissing general deterrence as a legitimate purpose of sentencing, as some do, the Eleventh Circuit has expressly stated that district courts should consider imposing "serious punishment" to "send a message" as a "primary objective" of its sentencing in fraud cases. *Kuhlman*, 711 F.3d at 1328. These considerations are no less important in this case. Employees like Defendant—who have access to the banking and financial transaction records of their employers—face an incredible temptation and have the access

and opportunity to easily steal significant sums of money and conceal it. When someone is caught and prosecuted for such conduct, the sentence should send a message to others who contemplate such schemes that these crimes are serious and carry with them a serious consequence. "Leniency undermines deterrence." *Howard*, 28 F.4th at 209 (citing *Kuhlman*). It "sends the wrong message and sends it loudly and clearly." *Id.*

Fourth, the need to avoid unwarranted sentence disparities counsels in favor of a guideline sentence. In *United States v. Natysin*, 966 F.3d 738, 739 (8th Cir. 2020) for example, the defendant—a bookkeeper/office manager—was sentenced to 46 months imprisonment after pleading guilty to wire fraud and tax fraud based on her embezzling only hundreds of thousands of dollars—a small fraction of what Defendant stole— from her employer and concealing the crime through her QuickBooks access. And in *United States v. Hendricks*, 434 Fed. Appx. 812 (11th Cir. 2011), the Court of Appeals affirmed a 60-month sentence for a defendant—a business manager and accountant—who forged company checks to embezzle over $500,000—again, a small fraction of what Defendant stole—from her employer. More recently, in April of this year, a defendant in Ft. Myers received a 120-month sentence for embezzling $4.1 million over six years from her employer using phony invoices to transfer company funds to accounts she controlled. *See United States v. Madelyn Hernandez*, Case No. 25-cr-00005-TPB (M.D. Fla. 2025) DE-4 (Plea Agreement); DE-34 (Amended J&C). Of course, every case is different, and a sentencing court must weigh every case on its own unique merits. But a below guideline sentence in this case would constitute an unjustified variance from similar cases involving far less financial harm.

Finally, Defendant's medical and psychological conditions do not override the need for a guideline sentence. There is no dispute that Defendant suffers from Chronic Obstructive Pulmonary Disease (COPD), a gambling problem, and other mental health issues like depression

6

and anxiety. Indeed, after reviewing the Defendant's recently filed expert witness disclosures, the government offered to stipulate to the opinions expressed therein to avoid the unnecessary expenditure of time and money on undisputed matters, especially when the money could be better spent repaying the victims. Defense counsel never responded to the offer. Regardless, in anticipation of Defendant's argument, the undersigned contacted representatives from BOP regarding Defendant's health concerns. After reviewing Defendant's medical records, BOP representatives reported that BOP's medical facilities can, and do, house and care for inmates with COPD, including those who require oxygen and use a BIPAP to sleep. BOP representatives also reviewed Defendant's currently prescribed medications and confirmed that BOP can supply those as part of BOP's regular formulary. Moreover, it bears noting that Defendant currently—while out of custody— smokes a pack of cigarettes every day. There is nothing worse for a COPD sufferer than smoking. BOP forbids smoking at its facilities and provides programs for smoking cessation. Therefore, ironically, a custodial sentence will ensure that Defendant stops the one activity that compromises her health most. Furthermore, even Defendant's medical expert agrees that it is not possible to accurately predict the course of her disease. Given that uncertainty, the appropriate response in this case is not a downward variance now, but a motion for compassionate release if or when Defendant's condition worsens. *See* 18 U.S.C. § 2582(c)(1)(A) (authorizing the district courts to reduce a term of imprisonment based on a showing of extraordinary and compelling reasons). If Defendant ever begins to suffer the type of truly debilitating health problems she anticipates, she can file a motion for compassionate release. In fact, BOP has the discretion to release Defendant even without court intervention if it decides her medical conditions warrant such relief. Recent experience with the pandemic has shown that BOP is more than capable of releasing inmates under appropriate circumstances.

Based upon the foregoing considerations, the government respectfully requests that the Court overrule defendant's request for a downward variance (or departure) and impose a sentence of 51 months imprisonment.[3]

Respectfully submitted,

JASON A. REDING QUINONES
UNITED STATES ATTORNEY

By:  *s/Jon M. Juenger*
Jon M. Juenger
Assistant United States Attorney
FL Bar No. 56108
99 Northeast 4th Street, Suite 400
Miami, Florida 33132-2111
Tel. (305) 961-9403
Fax (305) 530-7976
E-Mail: Jon.Juenger@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 11, 2025, the undersigned electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*s/Jon Juenger*
Jon Juenger
Assistant United States Attorney

---

3    Because all BOP facilities cannot accommodate COPD sufferers, the government recommends that the Court allow Defendant 90 days to self-surrender to the designated Federal Medical Center.

8